3-23-0-2-1-9 George H. Hatch, Louise B. Hatch, Robert B. King, and Margaret H. King plaintiffs Otis Dugan and Catherine Dugan, intervenors, appellants versus the City of Elmhurst, Appalachia. Thank you. Good morning. Good morning. Mr. Daniel, are you ready to begin? I am. You may start. Thank you. Good morning, Justices, Madam Clerk, staff. I do want to thank you. May it please the Court. I'm Mark Daniel with the Daniel Law Office. I represent Otis and Catherine Dugan. For 30 years, they've called a single-family lot their home in Elmhurst. Surrounded by that lot on all sides was residential development, residential land use, residential zoning. In 1971, prior to their ownership of the property, the City of Elmhurst was involved in litigation with a prior owner, the Hatches and others. The heading of the case is Hatch v. City of Elmhurst. The Hatches and their cohorts back in 1970 sought development of an apartment complex on a tract. If you can imagine a large square and to the left of that a rectangle extending from the bottom portion, that is the general shape of the development. I think it's on page A38 of the appendix to our brief where you can see the diagram showing that. The Dungans are in one of the three residential lots north of that rectangle that extends from the development tract. In 1970, the Hatches and others sued to declare that the City of Elmhurst zoning ordinance was unconstitutional as applied to their development of these apartments. The development tract was identified as that large square and the rectangle extending from it behind the Dungan residence. On a stipulated record, the Circuit Court held that the ordinance was unconstitutional as applied. In 1971, the Circuit Court enjoined the City from interfering with the development of the apartments on the development tract. As a part of that order, the Circuit Court said that no development will occur on that rectangular portion extending from the south side of the development tract. We refer to it as the transite parcel. It's open space. Nothing other than servicing was to be on that open space according to the 1971 judgment order. No one appealed, but no one built apartments. So years down the road, 19 or 20 years later in 1990, Council for the City of Elmhurst approached the Circuit Court and petitioned for an amendment to the judgment order from 1971. In that judgment order as requested by the City, the Circuit Court then ordered that instead of apartments, 13 townhomes could be built. But a condition of that order indicated that that open space, the transite parcel, or that rectangular parcel extending from the south end of the larger square, had to remain open space. Only surfacing would be allowed. No one appealed that order. The townhomes went up before and after that order. Over time, as alleged in the motion to add new parties or substitute parties, someone sold the open space separately from the development tract. And in 2023, there was construction in progress pursuant to a City of Elmhurst permit. That's the moment the City of Elmhurst failed to represent the Dungan's interest as neighbors to the property. Under Bredberg v. City of Wheaton, Aninson v. City of Chicago, cited in our briefs, the Elmhurst Supreme Court's been clear that neighbors have standing and an interest in what's going on from a land development perspective on neighboring property. With that construction, the Dungans petitioned to intervene. They petitioned the court with two attachments. One was the motion to substitute parties to bring in the new owner of the open space parcel that was supposed to have only surfacing. They also petitioned to enforce the judgment order from 1971, amended in 1990, that contained the provision saying that there should be no development other than surfacing on that open space parcel or the transit parcel. Now, this transit parcel was right behind the Dungan parcel to the south. The Dungans had two single-family homes on each side, and at the time they petitioned, they were interested in a large underground storm system, fencing, and lighting that's that was going in pursuant to the building permit. And those are structures other than surfacing. The circuit court denied the petition. Our review of this and our position at hearing was that the circuit court should have considered the standards for intervention and not jumped to the questions it addressed in its judgment. If you review the transcript, the circuit court stated that Dungans weren't original parties to the action, and the party that we are trying to enforce the order against also was not an original party. Well, of course, we're petitioning to intervene, and we move to substitute parties. So that was a consideration the circuit court made that is outside the realm of 2-408. The other issue the circuit court raised was that we were in way too many issues in our request to intervene. Now, that was incorrect. That was the result of argument from the city that went well beyond the petition. And mind you, the petition to intervene, the allegations of that petition, and the attachments are to be taken as true. Yet the judge ruled that there was too much coming into the case now, and it wasn't just a matter of enforcement. This was not a challenge to a zoning ordinance. This was a petition that sought to enforce the order regardless of what the city permitted from a zoning perspective. To the extent that the court made the decision on those narrow grounds, and outside of 2-408, the Dungans submit that the review here should be de novo because the standards were not applied, and in that light, the abuse of discretion standard should not apply. In this particular instance, we have a situation where the city asked for the 1991 amended order, and it received it. In our reply, we note the city's argument that the order's void shouldn't be heard here today. They're the ones that asked for the 1991 order. I'm sorry, the 1990 order. They're the ones that stipulated the facts leading to the 1971 judgment order. At no time did the language that is at issue in this case change. No structure other than surfacing on the open space or the transite parcel. That's the rule, and the Dungans still own their lot adjacent to it, and they have an interest in enforcing it. Now, I will note that some of the zoning hearing does come into play. Council before you here for the city told the plan commission and the city council that the city is free to do what it would like to, irrespective of the standing judgment in the Circuit Court of DuPage County. The legislature can ignore a judgment. The city argues that it has free will legislatively to do anything in the zoning context. Well, that's not the case here. It can do whatever it likes in the zoning context, but there is still a judgment order out there from 1971 amended in 1990 that says whatever the issue is on this property, there should not be a structure in place other than parking bollards, fences, landscaping, curbs, underground stormwater. I mean, all of these arguably are means to affect better surfacing, safer surfacing. I mean, and looking at Sinclair Pipe, isn't this the type of thing that the courts contemplate cities like Elmhurst being able to do after the fact? In other words, you're never going to have an order as was entered in 70 or 71 and amended in 91 that's going to address every single aspect of what's otherwise permitted. And why isn't this zoning ordinance simply what Sinclair Pipe is contemplating? And I realize not quite the issue, but you just brought it up. And now I have that question. Justice Brennan, on that point, we do note that that should have been an issue upon intervention when we're addressing the merits. But in response to your question, we're not asking you to do something in conflict with Sinclair Pipe. The second district had held in Fiore, which is cited in our briefs, that a standing judgment is not something that is subject to that same rule. Sinclair Pipe is a 19, I'm sorry, Fiore versus Highland Park is a 1968 case. And in the face of a judgment, after the mandate it issued, the city of Highland Park tried to amend the ordinance to avoid the effect of the judgment. And the second district was rather sharp in its criticism of the city for trying to do that and said that that was a violation of contrary to the legislative interest of the city. Now, yes, things change. If development in the area changed, the city might be able under Sinclair Pipe and the LaSalle factors and everything that follows from those analyses to look at those elements and say, well, maybe something changed in the area. But the capability of enforcement was not the issue when it comes to intervention. And whether there was a change in the trend of development or land use in the area, that's something for enforcement. I submit to you that there was not a change in development in the area, that the area remained the same as it was back in 1990 when the order was amended. But those are facts that the court should have gotten to upon intervention because the Dungans never had the opportunity to present those facts. So your position is this whole discussion is beyond the scope of the narrow issue that's before this court right now? Yes. My point is that discussion should have been had upon intervention, Justice Peterson. So if we think about it from the perspective of the Dungans, they wanted to present the basis that there are issues related to structures that are more invasive than surface parking. And that's what appears in the petition to enforce. They do mention structures. It's not the curbs or the surfacing, but there is a significant change in stormwater as a result of the stormwater structure. So they did have the interest being where they are in relation to the property in that stormwater ordinance, in that stormwater construction. But again, those are merits the comes up is if we're thinking about the standards for intervention, timeliness is always one of the concerns. First of all, there's no absolute rule, no per se rule that intervention after judgment is inappropriate. I think for the perspective of the passage of time in this case, if you take it in context, you have 1971 to 1990, and then the city's abandonment of its position in 2023. In 2023, with the construction underway, the Dungans filed their action in April, which is a lot less of a delay than what happened in Annenson versus city of Chicago, where there was a two or three year delay as the Annenson's in that instance, pursued the city, tried to urge the city to enforce their ordinances against somebody that was violating them, and then intervened. When did the ordinance pass? The ordinance passed, I believe in 2020. 2021, I believe it will fall in 2021. And you represented the Dungans and other neighbors before the city council as it relates to that ordinance and objecting to it, correct? Uh, no, Justice Brennan, I've got to be careful on that. I only represented the Dungans. I did not represent anyone else, but I only represented the Dungans. No, fair enough. That actually is the import of my question. So I guess in terms of the timing, I'm not so, I don't expect the Dungans to attempt to intervene when there's nothing going on from 1970 to, or whenever they purchased it until this ordinance, but at the point in time where they recognize that this ordinance against their interests passes in 21, shouldn't they have attempted to intervene and move forward at that point? And I guess this relates to another question I have, and I know your time's approaching, but I have this question. What is the MR case that was filed? The, let, let me, let me focus on the timing question first, Justice Brennan. When it comes to timing with the decision to approve the ordinance, I believe in October of 21, uh, the Dungans did not pursue a challenge to that ordinance because it wasn't believed that they could construct the development in accordance with that ordinance. And their effort here is not an enforcement of that ordinance or it's challenged to that ordinance. Uh, when the permit issued and we noticed that the lights were far, but far taller than allowed by code. And there was no variation in the ordinance. The lighting is the most significant factor here. And those are five or 10 feet from the bedroom windows of the house. And they are on all hours of the night, even though the ordinance has a limitation. Now, we're not in a position where the impact on the permit was felt until it was issued in violation of that zoning ordinance with respect to the, the question about the MR case. Um, there's no challenge to the zoning ordinance in that MR case. There's another case pending, uh, uh, right now it's before judge Fullerton. Um, and it was filed, I believe, I believe it was after this, um, but it was a case that sought to enforce the terms of the 2021 conditional use permit. So when, when I say to you that they didn't challenge that ordinance because they couldn't comply with it and they wouldn't, they wouldn't be able to proceed with the development. It turns out that we were correct. The city chose not to enforce its ordinance, issued the permit and a lawsuit over that and sued separately. And that involves the Dungans and another couple, uh, Kenneth and Sarah Blair. And that is pending before judge Fullerton. The city has taken steps to defend that permit. Uh, there is a trespass claim and currently a claim by the Blairs who live in the townhomes that were part of the development from 1990, challenging the forfeiture of that open space in a fashion similar where they would like to enforce that order as well. Judge Fullerton. So I guess my question is this, I just wanted to know the nature and scope of that litigation. And I ask it because of judge Wheaton's, uh, statement that the Dungans had alternative legal means to challenge some of their concerns. Would that qualify as it relates to judge Wheaton's observations? The Dungans brought a simple petition to enforce the ordinance. It wasn't a zoning challenge. It wasn't related to the building code. It wasn't relating to trespass. They just wanted to enforce the ordinance to avoid the fencing and the lighting that was causing the problem and the stormwater that was causing the problem. They, after the decision that judge Wheaton made, uh, they filed a lawsuit with the Blairs. I don't believe that case was pending before the decision. I think that that was, uh, perhaps a misstatement from argument in the record. Um, but that case is pending. The separate case is pending. They could certainly amend to add a claim, uh, similar to this one, or the cases could be amended procedurally. Thank you. Thank you. Um, do you want to conclude, uh, Mr. Daniel? If I may, Justice McDade, thank you, uh, for the time this morning. I think this is an important decision from several perspectives, um, in respect to the process for intervention, uh, to the merits of the case, uh, in order to deny the petition runs against the rule of accepting the facts stated as they're recited in the petition as true. Um, additionally, uh, the conclusions were incorrect. Uh, this is a situation where Fiore versus Highland Park and other cases fairly clearly recognize a line between legislative and Sinclair Pipeline and LaSalle. It flows in favor of the legislature's discretion, but when there's a judgment, there's a different story until a sufficient change in circumstances exists that denies the parties the ability to enforce that judgment. We would hope that you reverse and enter an order directing that intervention be allowed so proceedings can occur and further into the order. Thank you. Thank you. You will have five minutes for rebuttal. Um, Mr. Acker, are you ready? I am your honor. Thank you. And, uh, good morning to the justices. I appreciate the opportunity to be with you and to provide argument regarding, uh, this issue as an initial matter. Um, I think it's kind of, uh, the elephant in the room is that this project involves a construction of a parking lot during the zoning procedure. Attorney Daniel asserted that a parking lot was a structure and, uh, was at odds with the city considering the project where the city treats under its zoning ordinance, a parking lot as surfacing. So the restriction, uh, contained in the 1971 judgment and reaffirmed in the 1990 amended judgment was a restriction of surfacing, uh, other doing anything other than surfacing. Well, that's what we do. That's what the city approved. It is an approved project to surface this area as parking lot, the, uh, related issues of, uh, you know, the, the city zoning ordinance requiring, uh, additional safety features such as lighting, fencing, landscaping, bollards, underground storage. There's unfortunately, there's a significant overland, uh, flooding issue in this area. And the, uh, requirement the city had is that they needed to use permeable, permeable paving, and they needed to have some underground storage of stormwater. Uh, those are all objected to, uh, by the Dungans. Uh, vigorously, uh, they raised exactly the same issues that they are asserting, uh, in this petition. Uh, the petition is seeking, uh, really not to go against the city. It wants to realign the Dungans want to come into the, into this case, uh, as a defendant and they want to, uh, add, uh, Eggleston as a plaintiff. And then they want to proceed with a motion to enforce the judgment to prohibit and parcel. Uh, they want to enjoin the construction of light poles, fencing, bollards, signs, curving, and underground system. Um, that's, those are exactly the same rights that were granted by the city and its conditional use ordinance, uh, Z 0 2 7 2 2 2021 that was adopted on October 18th, 2021. Uh, rather than proceed with a complaint, uh, of DeNovo, uh, pursuant to, uh, see here 65, ILCS 5 slash 11 dash 13 dash 25 a within 90 days after questioning, whether or not the city's zoning ordinance adopted was arbitrary and capricious. Uh, they didn't, I would submit that they're barred, uh, from raising these issues, uh, collaterally, uh, you know, this is the lawsuit that is pending in 18 judicial circuit in front of judge Fullerton. Uh, the city is not a defendant. Uh, I had a discussion with the, with the defendant's attorney, Scott day earlier this week, where there apparently was a ruling on Mr. Daniel's complaint. And there was a number of significant findings that were made, uh, such that, uh, I believe that it's relevant for this court to understand, uh, specifically they found that the city's zoning ordinance. Well, can I interrupt? Cause I'm not sure about the propriety of supplementing the record orally. And I just, I'll back away from that and thank your arm. I mean, I, I don't, and I don't mean to speak for justice, uh, justices McDade and justice Peterson. If they want to hear that, that's great. No, that's fine. I, you know, I, it seemed as if your earlier questioning, you were interested in, I just wanted to know the nature of it. That's yes. And there's been some significant rulings that I'll, I'll bypass for the discussion. Um, the, the, the initial pleading that was submitted, uh, the city objected to on the basis of timeliness. Right. And I appreciate that there's a number of time periods that issue of the date that the zoning cases filed. It was in 1970. That's 54 years ago, 1971 judgment. Uh, that's 53 years ago. The date that that was Hunter, the 1990 amended judgment that was 34 years ago, the Dungans obtained their fee simple interest in the adjacent property 29 years ago. The, um, your honor, I believe identified that it's really what happened. Uh, once the zoning ordinance was adopted where the Dungans then should have known new or should have known that they had an interest quote unquote, that they needed to protect. Um, I would submit that the, that the filing of the petition in February of 2023 was not time. You know, this is, you know, yes. Right. The, the construction permit was for surfacing and then as well construction of the additional, uh, lighting, fencing, bollards, underground, uh, underground, uh, storage. All of that was part of the permit. Yes, your honor. Okay. Thank you. So the, the, the topic then of timeliness, I think is, is one that is, is primary, right? That's one of the fundamental requirements of 7735 ILCS five slash two dash four Oh eight, both a and B. Um, I, I do not believe from my review of the petition that there is any specific allegations made by, uh, the, the Dungans asserting that they were timely at all. It's completely omitted. Um, you know, the, the, the court went on to discuss, uh, that, you know, it didn't want to get to the issue of whether or not the underlying judgments were void ab initio, right? Didn't need to get to that because what it found was that what attorney Daniel wanted to do and the Dungans wants to do was expand the scope and issues of the case significantly. They were diametrically opposed. The litigation that occurred back when in 1971, 7071 was whether or not the city violated their constitutional rights by denying the construction of a multi-family residential property and rezoning of that. That's what was at issue. The court determined that because those parties are no longer in interest, the Dungans are strangers to that judgment. They have, you know, and what they're talking about enforcing has nothing to do with rezoning multi-family residential. It's a new issue that was not alleged in the original 1970 complaint was not placed at issue by the city's answer to that original complaint. I have no idea as I sit here now, how this restrictive covenant feature was included into the underlying judgment. No idea. And that's part of the gist here, right? The city didn't need to get to whether or not it was void out of Nishio because even assuming it applied, what the city is doing is allowing what was contemplated under the judgment, surfacing. That's what we're doing, surfacing. And the resultant surrounding areas of, you know, allowing the bollards and the fences and the lights, that's typical normal police power regulatory authority that we have in place for public safety. These issues are, I think, you know, are that Mr. Daniel was trying to get into is well beyond the scope of what this case was originally about. And that's why Judge Wheaton decided, I'm going to deny your petition. Go off and file something else as an original action. You don't need to file it here. And in fact, he did. So, you know, this, I'm sorry, go ahead, your honor. But don't you think what you're, what I'm hearing is you're really arguing that if they were allowed in, you got a dead bang winner, you're going to win because you're right on the law. Isn't that kind of what you're arguing? If they were, if they're allowed in to intervene? Yes, your honor. That's my position. And that's beyond the scope of our review. Well, let me put it this way. I think that the issue of what Judge Wheaton did is really what you're focused on. And I believe abuse of discretion is the proper standard. And I believe that it was within Judge Wheaton's scope of consideration and her discretion to deny this petition based upon her concerns that there are other actions available. And that's one of the considerations. I believe I cite this proposition. Sorry. Town of Centerville versus Deckard, right? That intervention should be denied where intervention would change the issues or raise new issues or unduly complicate the case. And that's exactly what Judge Wheaton did. She said, no, you're bringing in stuff that is too issue. The zoning of the multifamily residential, that's all done deal. You're bringing in new stuff. So anyways, you know, my notion of this, your honors, is that Judge Wheaton did not abuse her discretion. She considered this petition in a manner that was in a practical and legal sense of, is this going to be something beyond the scope of what this case is originally about? I guess the other things I should say, and again, I, you know, I'm sensitive to your comments about going beyond the scope of the intervention. I do think that this is a fairly straightforward issue. And I believe that the original analysis of timeliness is what should control. If the Dungans and Attorney Daniel thought this was such an important issue and their rights were being violated, they fully were aware of the existence of this judgment. And if they thought that the city was running afoul, it should have intervened not long after the October zoning ordinance was adopted. And I would suggest that that delay prejudiced the city in believing that they were not being, that there was no challenges that were going to be raised. They didn't file their complaint for administrative, for a Denover review. And we thought that the issue was what had been resolved. So we were lulled into believing that there was no concerns on behalf of Dungans beyond that, at least that's what happened with zoning. Once we have this case come forward, it was a complete surprise. And, and certainly, you know, we believe that, you know, these are matters that are, you know, well beyond my scope of experience as, as being an attorney for the city of Elmhurst that, you know, I was not around when these things occurred. I can't go back and ask the people what was going on in 1970, 71. They're not around. I don't know. But all I can tell you is that the provisions of this particular judgment that they're seeking to enforce raises, you know, this is the other thing that Judge Wheaton said, she's not sure that the allegations of the petition identified protectable rights. She's not sure about that. Now, Mr. Daniels suggested that, you know, that's what we should get into and litigate. And, you know, she chose not to because she thought that the issues that would be litigated would expand the scope reasonably believed to be necessary within what this case is about originally. So those are, those are the justifications that I'm offering for affirming Judge Wheaton's ruling. I really don't have much more to say to you, other than in the event that this case, you believe it needs to be remanded, that we would suggest that the city be allowed to go back to amend the judgment to allow the zoning, to allow the public safety improvements and to allow the removal of continuing jurisdiction and to put this thing to rest. I mean, you know, this could go on and add in for an item, you know, and all I'm saying is that we have interest in certainty and resolution of these matters. And it is our hope that this court will find that Judge Wheaton's determination should be affirmed. Thank you. Thank you, Mr. Acker. Are there any questions? No, thank you, Mr. Acker. Okay. Mr. Daniels, any rebuttal? Briefly. Justices, I'll note that this is the same issue that we had in the circuit court. You'll note for the first several minutes of the city's argument, they went well beyond the issues that were necessary and appropriate to consider for intervention. On the timeliness issue, there's an important portion of the record I want to call your attention to. It's at page A8 of the supplement, the appendix. And I think the point arises at line 20. To the extent that there was any question about timeliness, we had asked Judge Wheaton if we could amend. And she said on the next page, page 28, that it would not affect her decision and denied the amendment to the petition to clear up timeliness. In 2021, the city approved something. It was a conditional use ordinance. It's called a conditional use ordinance because it affects the use of land. Choosing not to challenge the use authorized under 1113.25 of the municipal code in a de novo action isn't a waiver or a delay on the structures going in beyond surfacing. There are millions of parking structures that have only surfacing. Having 20 to 22 foot tall lights? No. A lot of parking lots don't have that. A lot of parking lots don't have fences so close to the lot line that block your drainage. A lot of parking lots don't have underground storm systems that bring in tributary areas from outside the development site that never flow in the direction they flow. Those are the issues to address on intervention. To the extent that the city says that this could go on ad infinitum and the city should be allowed to deal with this permanently in its legislative discretion, let's think about how we got here. The city participated in a stipulated judgment order in 1971. In 1990, it amended that. There is always, in my view, a presumption of regularity, meaning judges don't make mistakes. They know their limits. They don't zone. You're not trying to put us out of a job. They would, and you don't look at a site plan and say, hey, I'll accept this if you make this area open space. The open space component was part of the development tract, and it was something so important that two chief justices in the 18th judicial circuit believed it should be reflected in the order, that it's a material component of the order, that I'm letting you build these structures, but that space is going to stay open, and it's important enough to me that it stay open other than surfacing, that I'm going to put it in the order, not just in 1971 but in 1990, and they ignore that and suggest that the chief justices, instead of being particularly careful, go beyond what's regularly expected of a circuit judge in a zoning case. You avoid rezoning, and you just review the plan before you in making your as-applied decision. That plan before the judge had that open space, and it carried forward into two orders, one of which the city sought. To the extent that the city suggests that we engaged in banter about opposing the zoning for the parking lot, think about this for a minute. It's one thing to have a surface that cars can park on. It's another to have it as a surface for a commercial restaurant with a banquet facility live entertainment and deliveries, pizza deliveries, going out of it every day. Challenging the use is different than challenging the additional structures, so their delay from 21 until the permit issued shouldn't really be considered here. I do want to wrap up. I thank you all for your time. I do think this is a very important issue because it's the camel's head under the tent. A lot of us are familiar with development, very familiar with it from all perspectives, but this camel's head under the tent and then blowing the tent open in violation of a court order cannot be sustained. Thank you. Thank you, Mr. Daniel. Are there any questions? No, thank you. We thank you very much for your argument this morning. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.